HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CORNHUSKER CASUALTY INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>CHRIS KACHMAN and DEBBIE KACHMAN, husband and wife; ROCKERIES, INC., a Washington corporation; LESTER MADDEN and JANE DOE MADDEN, husband and wife and the marial community comprised thereof; BROOK SAMPLES, individually and as Personal Representative of the Estate of LEANNE SAMPLES,<br><br>Defendants. | Case No. C05-5026 RBL<br><br>ORDER ON SUMMARY JUDGMENT |

THIS MATTER comes before the Court on cross motions for summary judgment. At issue is a variation of the so-called "mailbox rule." Plaintiff, insurer, sent a letter to its insured cancelling a commercial lines policy for non-payment of premium. The letter was sent via certified mail and was never actually received by the insured. Insured did not pay the premium prior to the cancellation date and the policy was cancelled. Three days later, a tragic accident occurred, allegedly caused by the negligence of the insured. For the reasons stated below, the Court concludes that the cancellation notice was effective and the insurance policy was cancelled before the accident. Plaintiff's motion for summary judgment [Dkt. #33] is **GRANTED** and Defendant Sample's Motion for Summary Judgment [Dkt. #42] is **DENIED**.

FACTUAL BACKGROUND

ORDER
Page - 1

1    Plaintiff Cornhusker Casualty Insurance Company ("Cornhusker") first issued the Homestate
2 Companies' Commercial Auto Policy, No. WAA000539, to Rockeries, Inc. ("Rockeries"), with effective
3 dates of June 28, 2000 through June 28, 2001. The policy renewed annually, with the last renewal
4 beginning on June 28, 2004, to expire on June 28, 2005. Over the course of the insurance contract(s)
5 Rockeries frequently failed to pay premiums when due. Notices of cancellation for failure to pay policy
6 premiums were sent to Rockeries on six separate occasions between 2001 and 2003. Notices were sent on
7 March 14, 2001, July 27, 2001, July 26, 2002, December 16, 2002, August 8, 2003 and September 15,
8 2003. All of the notices were sent to Rockeries in the same manner (certified mail, return receipt
9 requested). With the exception of the notice dated December 16, 2002, none of these mailings were
10 returned to Cornhusker. With one exception, Rockeries paid the premiums due on all of the previous
11 notices of cancellation before the cancellation dates stated in the notices. On one occasion, in 2001,
12 Cornhusker did receive a payment made after the date prescribed in a notice of cancellation. The payment
13 was, however, postmarked before the cancellation date and received within five days of the cancellation
14 date. In that instance, the payment was accepted and the policy was not cancelled.

15   The insurance policy which is the subject of this dispute had effective dates of June 28, 2004 to
16 June 28, 2005. On or about June 25, 2004, Cornhusker sent a renewal premium notice to Rockeries
17 informing it that the total premium for the policy was $10,223.00. No payment was due and owing at the
18 time for the renewal.

19   Rockeries customarily paid its premium in four equal installments. According to the terms of the
20 installment arrangement, premium payments were due in July, late August or early September, November
21 and February in each policy year. On July 13, 2004, Cornhusker sent a premium installment notice to
22 Rockeries. The installment notice indicated the total amount owing on the policy was $10,703.00. The
23 notice stated that a minimum installment payment of $2,555.75 was due on the policy, an $8.00 service
24 charge was charged, and a past due amount of $472.00 for a May 6, 2004 endorsement was owing, for a
25 total payment due in the amount of $3,035.75. The notice stated that the entire installment amount was
26 due by July 28, 2004.

27

28   On July 15, 2004, Cornhusker received a check from Rockeries in the amount of $472.00. The

 ORDER
Page - 2

sum of $2,563.75 remained unpaid as of the July 28 due date. On August 9, 2004, Cornhusker mailed via certified mail, an invoice and notice to Rockeries entitled "Cancellation Notice for Non-Payment Notice". The Notice stated that the policy would be cancelled on August 29, 2004 unless Rockeries paid $2,563.75 by that date. The insureds failed to pick up the mailing from the post office and the post office ultimately returned the notice to Cornhusker as unclaimed. On August 18, 2004, however, Cornhusker received a check from Rockeries in the amount of $3,035.75, which was $472.00 over the amount due and owing. As a result of the overpayment, $472.00 was credited to the insured's next premium installment. Cornhusker immediately sent a "rescind of Cancellation" notice to Rockeries indicating that Cornhusker received Rockeries' payment before the cancellation date. That same notice indicated that the next premium installment payment was due September 2, 2004.

Rockeries did not make a payment by September 2, 2004. On September 29, 2004, Cornhusker again sent via certified mail an invoice and cancellation notice to Rockeries entitled "Cancellation Notice for Non-Payment Notice". As before, the invoice and notice was sent to the insured's address listed on the policy, 9924 352nd St. E., Eatonville, Washington. The "Cancellation Notice for Non-Payment Notice" informed the insureds that the policy would be cancelled at 12:01 a.m. on October 19, 2004 unless Cornhusker received payment of $1,948.75 by October 19, 2004. Also consistent with prior practice, the invoice and cancellation notice was sent to Rockeries' broker and to three entities listed as loss payees on the policy.

The post office attempted delivery of the certified letter on October 5, 2004. A notice was left advising Rockeries that it was holding a certified letter at the post office for Rockeries. A second notice was left on October 15, 2004. (Decl. of Paula Oates, Dkt. #36). The insureds again failed to pick up the certified mailing from the post office, so it was mailed back to Cornhusker on October 21, 2004.[1] Cornhusker received the returned certified letter on November 1, 2004. The policy was cancelled on October 19, 2004 for non-payment of premium. On October 22, 2004 an accident involving one of the insured's trucks occurred. Rockeries informed its broker of the loss on October 25, 2004 and mailed an installment premium payment to Cornhusker. The payment was received by Cornhusker on October 28,

---

[1] The owners of Rockeries deny that a notice of attempt to deliver certified mail was left in their mailbox on or after October 5, 2004. (Decl. of Debbie Kachman (Dkt. #44) and Chris Kachman (Dkt. #45)).

ORDER
Page - 3

2004. Cornhusker returned the unearned premiums to Rockeries and confirmed the policy cancellation effective October 19, 2004.

The Samples brought an action against the Insureds, Rockeries, Inc. and the Kachmans. This Declaratory Judgment action followed.

Cornhusker seeks a determination that the policy was effectively cancelled prior to the accident and that the losses are not covered by the policy.

## DISCUSSION

A.  Summary Judgment Standard.

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

B.  The Commercial Lines Policy issued to Rockeries Inc. was effectively cancelled for non-payment of premium.

RCW 48.18.290 requires that an insurer mail written notice of cancellation to the insured, stating the reason why the policy will cancel, at least ten (10) days before the policy will cancel. The notice of cancellation must also be "delivered or mailed" to any person or entity "shown by the policy to have an interest in any loss . . . thereunder." RCW 48.18.290(1)(b). The mailing of the notice of cancellation will be deemed effective if it is "deposited in a United States post office letter depository in a sealed envelope, with prepaid postage affixed, and directed to the insured's last known address as known to the insurer or as shown by the insurer's records." RCW 48.18.290(2). The affidavit of the person making or

supervising the mailing of the notice "shall constitute prima facie evidence of such facts of the mailing as are therein affirmed." RCW 48.18.290(3). Following cancellation, the insurer is required to compute on a pro rata basis, any amount of unearned premium owed to the insured and return it to the insured as soon as possible. RCW 48.18.290(4).

The efforts undertaken by Cornhusker to cancel Rockeries' commercial lines policy were in full compliance with the Washington statute and its own policy requirements.[2] The material facts supporting this conclusion are not disputed.

Defendant Samples argues strenuously that certified mail does not comply with the legislative intent of RCW 48.18.290 because it is not reasonably calculated to result in actual delivery of the cancellation notice to the insured. Certified mail, return receipt requested, requires a signature from the recipient in order to be received. If the recipient is not present to sign, the mail is returned to the sender, as occurred in this case. Samples argues that this procedure means that certified mail is not reasonably calculated to ensure receipt. Numerous court decisions support the conclusion that certified mail, return receipt requested, is not a sufficiently reliable means of notifying the insured of the need to find new coverage, that it can be elevated toan irrebuttable presumption that equates to a rule of law. See *Conrad v. Universal Fire & Cas. Ins. Co.*, 686 N.E.2d 840 (Ind. 1997), *Laracque v. Rhode Island Joint Reinsurance Ass'n.*, 536 A.2d 529, 532 (R.I. 1988), *American Automobile Ins. Co. v. Watts*, 67 So. 758 (Ct. App. Ala., 1914), *Kamille v. Home Fire & Marine Ins. Co.*, 129 Misc. 536, 221 N.Y.S. 38 (NY Sup. 1925), *Fichtner v. State Farm*, 148 Misc. 2d 194, 560 N.Y.S. 2d 94 (N.Y. Sup. 1990). Each of the cases cited by defendants interprets policy language selected by the insurer and rejects certified mail as an appropriate method of mailing a cancellation notice. These cases either rely on the notion that the term "mail" in the policy was ambiguous and the interpretation most favorable to the insured must be applied, *Watts, Id.*, or that the carrier should bear the responsibility for the method of mailing and failure to achieve actual delivery renders the cancellation ineffective. *Larocque* and *Werner, Id.*

In the case now before the Court, the requirements for achieving effective cancellation for non-

---

[2] The Homestate Companies Commercial Lines Policy issued to Rockeries tracks the statute by requiring that Cornhusker give written notice of cancellation to the named insured and the named insured's agent or broker stating the actual reason for the cancellation, to the last known mailing address, at least ten (10) days before the effective date of cancellation.

payment of premiums were mandated by the legislature and not the insurer.  The language chosen by the legislature is not ambiguous and it could reasonably be expected that an insurance company, in a highly regulated industry, would follow the statute literally.  The statute, in simple language, indicates how mailing is to be accomplished: by prepaying postage and placing the letter in a letter depository of the United States post office.  The language is mandatory and clearly permits general delivery mail and certified mail to accomplish its intended purpose.  The policy cancellation was effective upon compliance with the statute and actual receipt by the insured is not required.  Proof of mailing is all that is required. *Wisniewski v. State Farm Gen. Ins. Co.*, 25 Wn. App. 766, 767 (1980).

In reaching this conclusion, the Court is mindful of the proposition that a statute should be construed as a whole in order to ascertain legislative purpose, and thus avoid unlikely, strained or absurd consequences which could result from a literal reading.  *State v. Evans Campaign Comm.,* 86 Wn.2d 503, 508, 546 P.2d 75 (1976).  "That the spirit or purpose of legislation should prevail over the express but inept language is an ancient adage of the law."  *Alderwood Water Dist. v. Pope & Talbot, Inc.*, 62 Wn.2d 319, 382 P.2d 639, 641 (1963).  On the other hand, "where, as here, the statute's words are unambiguous, the judicial inquiry is complete."  *Desert Palace v. Costa,* 123 S.Ct. 2148, 2153 (2003).

Some may view the Court's conclusion as harsh and advocate that the Court seek refuge in some time-honored rule of statutory construction that, from time to time, is used to circumvent the plain language of a statute.  This the Court will not do.  This Court can, and the Washington legislature unquestionably did, conjure up scenarios that reach unfortunate or unrealistic outcomes no matter what requirements were imposed to achieve effective policy cancellation.  Whether the legislature compelled actual delivery of the notice or expressly limited notice to general delivery mail to render cancellation effective, some constellation of facts could form in the future to compel a legal conclusion that some might view as unfair.  At the end of the day, it is this Court's conclusion that the legislative language in RCW 48.18.290 is neither inept nor ambiguous.  Where a statutory provision is plain on its face, the Court must give effect to that plain meaning as an expression of legislative intent.  *Sheehan v. Central Puget Sound Regional Transit Authority*, 155 Wn.2d 790, 797, 123 P.3d 88 (2005).

C.      <u>Cornhusker is not estopped from cancelling the policy.</u>

ORDER
Page - 6

Courts disfavor equitable estoppel and the party raising the claim must establish each element by clear, cogent, and convincing evidence. *Henderson Homes, Inc. v. City of Bothell*, 124 Wn.2d 240, 249, 877 P.2d 176 (1994). Courts can decide as a matter of law that the insurer is not estopped from asserting that coverage was cancelled. *See, e.g., Seattle Pump Co. v. Traders & Gen. Ins. Co,*, 93 Wn. App. 743, 749-50, 970 P.2d 361 (1999).

In limited circumstances, an insurer may be equitably estopped by its conduct from denying coverage to its insured if the insured justifiably relies on such conduct. *Isaacson v. DeMartin Agency, Inc.*, 77 Wn. App. 875, 880, 893 P.2d 1123 (1995). To prove equitable estoppel, the insurer must show (1) a course of conduct inconsistent with the claim afterward asserted; (2) reasonable reliance by the insured on the faith of such conduct; and (3) injury to the insured resulting from allowing the insurer to contradict or repudiate such conduct. *Saunders v. Lloyd's of London*, 113 Wn.2d 330, 340, 779 P.2d 249 (1989).

In this case, it is argued that because Cornhusker accepted late payments from Rockeries in the past, it should be estopped from cancelling Rockeries' policy. As stated earlier, Cornhusker on one occasion accepted payment and rescinded a prior cancellation. Under Washington law one instance will not establish a course of conduct that will support waiver or estoppel. *Saunders*, 113 Wn.2d at 342; *Isaacson*, 77 Wn. App. at 880.

It is also argued that the installment payment plan led Rockeries to believe that it could pay one-quarter (1/4) of the annual premium every three (3) months. The evidence, however, conclusively establishes that the course of conduct and the written premium notices called for payments to be made in July, late August or early September, November and February. The payment that was missed leading to cancellation was due on September 2, 2004. There is simply no course of conduct evident from the facts of this case that would justify a reasonable person to conclude that clearly expressed due dates for

premium payments could be disregarded with impunity in favor of an alternative schedule that was never discussed, let alone negotiated.

Plaintiff's Motion for Summary Judgment [Dkt. #33] is **GRANTED** and Defendant Samples' Motion for Summary Judgment [Dkt. #42] is **DENIED.**

IT IS SO ORDERED this 19th day of January, 2006.

/s/ Ronald B. Leighton
RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE